UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY<br>OF THE UNITED STATES<br>2100 L. St., N.W.<br>Washington, DC 20037,<br><br>　　　　　Plaintiff,<br>　v.<br><br>ED SCHAFER, Secretary,<br>U.S. Department of Agriculture<br>1400 Independence Ave., S.W.<br>Washington, DC 20250,<br><br>ALFRED V. ALMANZA, Administrator,<br>Food Safety and Inspection Service<br>U.S. Department of Agriculture<br>1400 Independence Ave., S.W., Room 331-E<br>Washington, DC 20250,<br><br>　　　　　Defendants. | Civ. No. _____ |

**COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

1.　This action challenges a United States Department of Agriculture ("USDA") regulation that fails to prohibit all non-ambulatory ("downed") cattle – those too injured or sick to stand and walk – from being slaughtered for human consumption, even though Defendants have been telling the public for years that all such animals are in fact excluded from the human food supply. The slaughter of downed cattle involves extreme animal cruelty and jeopardizes human health because such animals are at a heightened risk for bovine spongiform

encephalopathy ("BSE") (commonly known as "mad cow disease") and other foodborne transmissible diseases.

2. Although Defendants have enacted a regulation that represents in its preamble that it prevents downed cattle from being slaughtered for human consumption, the fine print of the regulation actually allows some downed cattle to enter the food supply. *See* Prohibition of the Use of Specified Risk Materials for Human Food and Requirements for the Disposition of Non-Ambulatory Disabled Cattle; Prohibition of the Use of Certain Stunning Devices Used To Immobilize Cattle During Slaughter, 72 Fed. Reg. 38,700 (July 13, 2007) ("Final Rule"). The effects of this loophole can be disastrous – as demonstrated by the recent recall of more than 143 million pounds of potentially tainted ground beef, at least one-third of which was purchased by the federal government and fed to school children (including Plaintiff's members' children) in at least 40 states and the District of Columbia.

3. Because this regulatory loophole was enacted without adequate public notice under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA"), and violates the agency's mandates under the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.* ("FMIA") and Humane Methods of Slaughter Act, 7 U.S.C. §§ 1901 *et seq.* ("HMSA"), it should be remanded to the agency with instructions to close this dangerous and arbitrary loophole immediately.

## Jurisdiction

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## Parties

5. Plaintiff The Humane Society of the United States ("The HSUS") is a nonprofit animal protection organization headquartered in Washington, D.C., with regional offices across the country. The HSUS has 10.5 million members and constituents. The HSUS brings this action on its own institutional behalf and also on behalf of its members, including those who eat beef or whose children eat beef in schools and child care facilities that participate in the National School Lunch Program, 42 U.S.C. §§ 1751 *et seq.*

6. The HSUS actively advocates against practices that harm farm animals, including those raised for meat, eggs, and milk, and strives to inform the public about the threats caused by such practices, including the potential public health problems associated with the practice of slaughtering diseased and disabled animals for human consumption. For example, in October and November 2007, HSUS conducted an undercover investigation at the slaughter and processing establishment of Hallmark Meat Packing Company and Westland Meat Company, Inc. (collectively "Hallmark/Westland"), in Chino, California. The investigation revealed that Hallmark/Westland unlawfully and inhumanely handled and slaughtered downed and potentially diseased cattle for subsequent distribution through federal assistance programs including the National School Lunch Program.

Illegal acts at the plant were flagrant, systemic, pervasive, and egregious. Workers were seen and documented engaged in the following illegal conduct:

- a. dragging downed cattle with heavy metal chains attached to a forklift;
- b. kicking animals in the face;
- c. ramming wooden paddles into animals' faces and eyes;
- d. shocking the faces, eyes and bodies of sick, injured, or downed cattle who were unable to move, causing the animals to bellow out in pain;
- e. repeatedly shocking a cow with an electric prod until the animal collapsed; animals remaining in the chute were driven over the downed cow causing the cow to be trampled;
- f. repeatedly slamming into downed cattle with a forklift while the animals flailed helplessly on the pavement, unable to right themselves;
- g. running over downed cattle with a forklift;
- h. hoisting downed cattle in the air with a forklift and dropping the animals onto the pavement; and
- i. blasting downed cattle in the face with a high pressure water hose for several consecutive minutes, simulating drowning, causing the animals to thrash and struggle for air.

7. Following publication of the investigation, Hallmark/Westland initiated, at USDA's request, a recall of more than 143 million pounds of meat, the largest beef recall in U.S. history to date. Release No. 0047.08, USDA, Transcript of Technical Briefing Regarding Hallmark/Westland Meat Packing Company Two Year Product Recall (February 17, 2008). Hallmark/Westland, which was a major supplier of beef to USDA's Commodity Procurement Branch, purchased end-of-production, or "spent," dairy cows to process into ground beef for the National

4

School Lunch Program. Approximately 50.3 million pounds of the beef recalled by Hallmark/Westland went to federal nutrition programs, including the National School Lunch Program, and of those 50.3 million pounds, about 19.6 million pounds had already been consumed at the time the recall was issued. Release No. 0054.08, USDA, Transcript of Technical Briefing – Hallmark/Westland Meat Packing Company (Feb. 21, 2008).

8. The Hallmark/Westland investigation demonstrated that downed cattle are subjected to cruel and inhumane treatment for the sole purpose of getting them through ante-mortem inspection and into the slaughter facility. Because of USDA's regulatory loophole, the meat industry has an economic incentive to use whatever means are necessary to force downed cattle to stand and walk, even if only for this brief period of time. The HSUS has been and will continue to be injured by USDA's regulatory loophole because it has committed and will continue to commit substantial financial and human resources to investigating animal handling, working to end egregious suffering inflicted on farm animals, and warning its members and the public about the problem of downed cattle entering the food supply.

9. HSUS members that consume meat products, including beef products, are concerned about eating adulterated meat products and the health risks associated with such adulterated meat. Specifically, they are concerned that downed cattle are at an increased risk for harboring and transmitting BSE prions and other

pathogens. The consumption of meat products derived from BSE-infected cattle is believed to cause a human neurological disease known as variant Creutzfeldt-Jakob disease ("vCJD"). The disease is progressive, invariably fatal, and there is no known effective treatment or cure. Downed cattle may also be at higher risk for harboring other foodborne transmissible pathogens, including *E. coli* O157:H7, *Salmonella*, and anthrax. By allowing downed cattle to enter the food supply, USDA's regulatory loophole injures members of The HSUS by placing them at an increased risk of contracting these food-borne illnesses each time they eat beef.

10. Members of The HSUS are also concerned about the meat products provided to their children through the National School Lunch Program. More than 31 million school children receive lunches through the program each school day. To assist states in providing healthful, low-cost or free meals, USDA provides states with various commodities including ground beef. As evidenced by the Hallmark/Westland investigation and recall, the potential for downed animals to make their way into the National School Lunch Program is neither speculative nor hypothetical.

11. The majority of downed cattle are dairy cows who are ultimately slaughtered for human consumption. Annually, several million culled dairy cows enter the food supply as ground beef.

12. Children are more likely than healthy adults to experience severe illness requiring treatment and hospitalization as a result of pathogens such as *E. coli* O157:H7 and *Salmonella*.

13. Because of the low grade cattle in poor condition used to produce beef purchased for the National School Lunch Program, and the particular susceptibility of children to various foodborne pathogens, the children of members of The HSUS have been placed at an increased risk of serious health problems as a result of USDA's regulatory loophole that allows downed cattle to enter the food supply.

14. Defendant Ed Schafer is the Secretary of Agriculture and has ultimate responsibility for ensuring that agencies within USDA comply with the mandates of Congress and with the requirements of the APA, FMIA, and HMSA. He is being sued in his official capacity.

15. Defendant Alfred V. Almanza is the Administrator of the Food Safety and Inspection Service ("FSIS"), an agency within USDA that promulgated the Final Rule at issue here. Administrator Almanza has ultimate responsibility for ensuring that FSIS complies with the mandates of Congress and with the requirements of the APA, FMIA, and HMSA. He is being sued in his official capacity.

## Statutory Framework

### A. Federal Meat Inspection Act

16. The FMIA is a comprehensive statutory inspection scheme designed to protect the health and welfare of consumers. USDA's paramount duties under the FMIA are to determine whether meat products are "adulterated" and to prevent adulterated meat products from entering the food supply. 21 U.S.C. § 602. Section 601 provides that food is "adulterated" under a number of different circumstances. Food is adulterated "if it bears or contains any poisonous or deleterious substance which may render it injurious to health." *Id.* § 601(m)(1). It is also adulterated "if it consists in whole or in part of any filthy, putrid, or decomposed substance or is *for any other reason,* unsound, unhealthful, unwholesome, or *otherwise unfit for human food.*" *Id.* § 601(m)(3) (emphasis added).

17. The FMIA requires USDA inspection of animals both before slaughter (ante-mortem) and after slaughter (post-mortem) to ensure that no "adulterated" meat enters into the food supply. *Id.* §§ 603-606. Accordingly, USDA is to mark carcasses that it determines to be adulterated as "Inspected and condemned," and any condemned meat "shall be destroyed for food purposes." *Id.* §§ 604, 606. The FMIA authorizes USDA to promulgate rules and regulations necessary to give effect to the Act. *Id.* § 621.

**B.     Humane Methods of Slaughter Act**

18.    The HMSA, 7 U.S.C. §§ 1901 *et seq.*, provides that "the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901. In addition to prohibiting slaughtering and handling methods that are not humane, 7 U.S.C. § 1902, the HMSA directs the Secretary of Agriculture to investigate and develop humane methods for slaughtering and handling livestock in connection with slaughter. 7 U.S.C. § 1904.

**C.     Administrative Procedure Act**

19.    The APA requires that agencies must: (1) publish notice of proposed rulemaking in the Federal Register; (2) give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation; (3) publish the substantive rule no less than thirty days before the effective date; and (4) give an "interested person" the right to petition for the issuance, amendment, or repeal of a rule. 5 U.S.C. § 553.

20.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court shall also hold unlawful and set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## Facts Giving Rise to Plaintiff's Claims for Relief

### A. The Connection Between Mad Cow Disease and the Slaughter of Downed Cattle

21. BSE is a transmissible spongiform encephalopathy ("TSE") of cattle that may manifest with behavioral symptoms, earning the disease it colloquial name "mad cow disease." BSE was first documented in the United Kingdom in 1986 and has since spread to 24 countries around the world. BSE is thought to be spread by the practice of feeding cattle the brains and other central nervous system tissues of infected cattle. Cows are herbivores by nature.

22. TSEs such as BSE are characterized by the debilitating neurological impacts they have on their victims. Following an incubation period which may last months or years, TSEs cause tiny holes in the brain which slowly cause the victim to lose mental and physical abilities and to eventually die. BSE in cattle has an incubation period of approximately two to eight years. In 1996, ten years after BSE was documented in cattle, a new human TSE was recognized, variant Creutzfeldt-Jakob Disease ("vCJD"), believed to be caused by the consumption of meat products derived from BSE-infected cattle. vCJD has been described as "Alzheimer's in fast forward." The disease is progressive, invariably fatal, and there is no known cure or effective treatment.

23. The first U.S. case of BSE was discovered in December 2003 in a six-year-old dairy cow slaughtered in Washington State. According to a USDA veterinarian, the infected cow was a downed cow who was unable to stand. The cow

was slaughtered on December 9 and shipped to two processing plants. Test results confirmed the disease on December 23, and the following day, 10,410 pounds of beef were recalled to prevent contaminated meat from entering the human food supply. On December 30, then-USDA Secretary Ann Veneman announced several policies to strengthen protections against BSE: "Effectively immediately, USDA will ban all downer cattle from the human food chain." Release No. 0452.03, USDA, USDA BSE Update (December 30, 2003).

B.  **USDA's Interim Rule**

24.  Two weeks later, on January 12, 2004, USDA did just what it represented to the public, issuing an interim final rule to safeguard human health and the Nation's food supply:

> Because they present a risk of introducing the BSE agent into the human food supply, FSIS has determined that *the carcasses of non-ambulatory disabled cattle are unfit for human food under section 1(m)(3) of the FMIA and that all non-ambulatory disabled cattle that are presented for slaughter should be condemned.* Therefore, FSIS is amending its ante-mortem inspection regulations to require the condemnation of non-ambulatory disabled cattle presented for slaughter.

Prohibition on the Use of Specified Risk Materials for Human Food and Requirements for the Disposition of Non-Ambulatory Disabled Cattle, 69 Fed. Reg. 1,862, 1,870 (Jan. 12, 2004) (emphasis added) ("Interim Rule"). The Interim Rule amended regulations that implemented the FMIA and governed FSIS' ante-mortem and post-mortem inspection of cattle at slaughter.[1]

---

[1] The Interim Rule defined "non-ambulatory disabled livestock" as "livestock that cannot rise from a recumbent position or that cannot walk, including, but not limited to, those with broken appendages, severed tendons or ligaments, nerve

25. According to USDA, the Interim Rule prohibited the slaughter of downed cattle regardless of where and when they became non-ambulatory. *Id.* at 1,870-71. The Interim Rule provided:

> FSIS is excluding all non-ambulatory disabled cattle from the human food supply, regardless of the reason for their non-ambulatory status or the time at which they became non-ambulatory. Thus, if an animal becomes non-ambulatory in route to the establishment due to an acute injury, it must be humanely removed from the truck, humanely euthanized, and the carcass properly disposed of. Likewise, cattle that become non-ambulatory on the establishment premises, such as an animal that breaks its leg as it is unloaded from the truck, are also required to be humanely moved, humanely euthanized, and the carcass properly disposed of.

*Id.* at 1,870.

26. The Interim Rule explains its rationale for the complete ban on processing of downed cattle for human consumption by citing science which demonstrates that downed cattle are far more likely to be BSE-infected than cattle able to stand and walk. Indeed, the Interim Rule states that non-ambulatory cattle are 49 to 58 times more likely to have BSE than cattle identified through passive surveillance, *i.e.*, those reported to veterinary authorities as BSE-suspect based on clinical observation. *Id.*

C.   **USDA's Final Rule**

27. In July 2007, a few months after the fourteenth case of mad cow disease was confirmed in North America and more than three years after

---

paralysis, fractured vertebral column, or metabolic conditions." *Id.* at 1,873 (codified at 9 C.F.R. § 309.2(b)). The agency stated that the new definition "more accurately describes the cattle [the agency] believes should be prohibited for human food." *Id.* at 1,870.

promulgation of the Interim Rule, USDA promulgated an "affirmation of interim final rules with amendments." Prohibition of the Use of Specified Risk Materials for Human Food and Requirements for the Disposition of Non-Ambulatory Disabled Cattle; Prohibition of the Use of Certain Stunning Devices Used To Immobilize Cattle During Slaughter, 72 Fed. Reg. 38,700 (July 13, 2007) ("Final Rule"). The Final Rule was adopted without providing advance public notice or comment, despite the fact that it significantly amended and weakened the Interim Rule. *Id.* at 38,701.

28.     The comments and responses section in the Final Rule claimed that USDA "affirm[ed] the prohibition on the slaughter of non-ambulatory disabled cattle offered for slaughter for human food." *Id.* at 38,702. It explained that:

> As noted by some of the comments, the clinical signs of BSE are often subtle, and many typical signs, such as gait disturbances, can only be observed in an animal that is able to rise from a recumbent position and walk. FSIS agrees that if an animal with clinical BSE is non-ambulatory due to an acute injury, such as a broken leg or torn ligament, the injury may be the prominent or sole presenting sign. Furthermore, the fact that there have been confirmed cases of BSE in North America in non-ambulatory cattle that had been observed by veterinarians prior to slaughter that had not been identified as BSE clinical suspects provides evidence that *the underlying reason for an animal's non-ambulatory condition cannot always be accurately ascertained* when these animals are presented for slaughter.

*Id.* at 38,702-03 (emphasis added). The comments and responses section of the Final Rule also affirmed that "carcasses of non-ambulatory disabled cattle offered for slaughter *are adulterated.*" *Id.* at 38,705 (emphasis added).

29. In addition, the comments and responses section of the Final Rule explained that the prohibition on slaughtering downed cattle was also aimed at ensuring the humane handling of livestock in connection with slaughter, as required by the HMSA. *Id.* at 38,722. The agency noted that most of the comments received in response to the Interim Rule were "submitted by animal welfare organizations and citizens concerned about the welfare of animals." *Id.* at 38,701.

30. Even though the preamble and comments and responses section of the Final Rule purport to continue the complete prohibition on slaughtering downed cattle for human consumption, the binding portions of the Final Rule do not.

31. Instead, the binding portions of the Final Rule quietly reversed course by amending the Interim Rule to *permit* some downed cattle to be slaughtered for human consumption. The Final Rule provides that "FSIS inspection personnel will determine the disposition of cattle that become non-ambulatory after they have passed ante-mortem inspection on a case-by-case basis." *Id.* at 38,729 (codified at 9 C.F.R. § 309.3(e)).

**D.    Practical Impacts of USDA's Downed Cattle Loophole**

32. The extreme danger associated with the Final Rule's failure to prohibit all downed cattle from being slaughtered for human consumption is confirmed by The HSUS' recent investigation of the federally inspected Hallmark/Westland slaughtering establishment, and the resulting recall of millions of pounds of potentially tainted ground beef.

33. The HSUS investigator at Hallmark/Westland witnessed and documented egregious acts of cruelty to cattle who were too sick or injured to stand or walk to slaughter on their own power. The investigator documented workers physically abusing animals, electrically shocking sensitive body parts such as their eyes, forcing a cow to crawl to the kill box on her knees, running over and injuring cattle with a forklift, and blasting cattle in the face with a high-pressure water hose for several minutes to simulate drowning. In every instance, these and other inhumane acts were carried out to force downed cattle to walk – or in some cases crawl – to the kill box to be slaughtered.

34. The HSUS' Hallmark/Westland investigation revealed systematic flaws in USDA's Final Rule. Because of the Final Rule's regulatory loophole, the meat industry has an economic incentive to use whatever means it deems are necessary to force downed cattle to stand and walk, even if only for the brief period of time necessary to slaughter them for human consumption.

35. As described in paragraphs 21-22, BSE is a TSE, a species of disease characterized by the debilitating neurological impacts they have on their victims. The incubation period for this class of diseases in humans can be long, with the interim between eating contaminated meat and developing symptoms potentially extending for decades. Therefore, the full impact that the consumption of Hallmark/Westland beef has had on consumers, including Plaintiff's members' children in the National School Lunch Program, may not be known for many years.

## Plaintiff's Claims for Relief

**Claim One – Violation of the Administrative Procedure Act, 5 U.S.C. § 553**

36. Plaintiff incorporates herein by reference, as though fully set forth, all of the allegations contained in paragraphs 1-35 above.

37. By changing their regulation on downed animals to allow some downed cattle to be slaughtered for human consumption, without providing adequate advance public notice and an advance opportunity to comment on this new loophole, Defendants have violated the Administrative Procedure Act, 5 U.S.C. § 553.

38. This violation has caused and will continue to cause Plaintiff's injuries as described in paragraphs 5-13.

**Claim Two – Violation of the Administrative Procedure Act, 5 U.S.C. § 706**

39. Plaintiff incorporates herein by reference, as though fully set forth, all of the allegations contained in paragraphs 1-35 above.

40. By representing to the public that downed cattle are excluded from the food supply, but at the same time quietly creating a regulatory loophole by which downed cattle are slaughtered for human consumption, Defendants have violated the Federal Meat Inspection Act and Humane Methods of Slaughter Act, abused their discretion, acted arbitrarily and capriciously and not in accordance with law, and acted without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

41.  This violation has caused and will continue to cause Plaintiff's injuries as described in paragraphs 5-13.

**WHEREFORE**, Plaintiff requests that the Court issue an Order:

1. Declaring that Defendants' Final Rule allowing some downed cattle to be slaughtered for human consumption is arbitrary and capricious, and not in accordance with the Administrative Procedure Act, the Federal Meat Inspection Act, and the Humane Methods of Slaughter Act;

2. Maintaining the current Final Rule in place, but remanding for new rulemaking to close the downed cattle loophole;

3. Preliminarily and permanently enjoining Defendants from allowing downed cattle to be slaughtered for human consumption;

4. Awarding Plaintiff its costs and reasonable attorneys' fees; and

5. Awarding Plaintiff any other relief that is just and proper.

Respectfully submitted,

Sarah L. Conant
(D.C. Bar No. 493130)

Peter Petersan
(D.C. Bar No. 487605)

_____
Jonathan R. Lovvorn
(D.C. Bar No. 461163)

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L. St., N.W.
Washington, DC 20037
(202) 676-2325

Attorneys for Plaintiff

February 27, 2008

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

The Humane Society of the United States

## DEFENDANTS

Ed Schafer, Secretary, United States Department of Agriculture
Alfred V. Almanza, Administrator, Food Safety and Inspection Service

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Washington, DC
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Washington, DC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Sarah L. Conant
The Humane Society of the United States
2100 L St., NW
Washington, DC 20037
(202) 676-2325

ATTORNEYS (IF KNOWN)

Jeffrey A. Taylor, U.S. Attorney
555 Fourth St., NW
Washington, DC 20530
(202) 514-7566

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

● **C.** *Administrative Agency Review*

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*    OR    ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ○ H. *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ○ I. *FOIA/PRIVACY ACT*<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ○ J. *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ○ K. *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ○ L. *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ○ M. *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ○ N. *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Administrative Procedure Act, 5 U.S.C. 553, 706; failure to provide notice and comment; agency action arbitrary, capricious and not in accord. with law.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____   Check YES only if demanded in complaint
**JURY DEMAND:**  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  2/27/08   SIGNATURE OF ATTORNEY OF RECORD  *Sauli Cut*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.